BAIRD MITCHELL *et al.* v. CONSTITUTION INDEMNITY COMPANY OF PHILADELPHIA, a *Corporation*

(No. 7487)

Submitted May 9, 1933.  Decided May 23, 1933.

*Austin V. Wood,* for plaintiffs in error.

*Nesbitt & Nesbitt* and *Hall, Goodwin & Paul,* for defendant in error.

MAXWELL, PRESIDENT:

Plaintiffs were awarded a writ of error to a judgment of the circuit court refusing to grant them a new trial upon one controversial matter and setting aside, a directed verdict for them and granting defendant a new trial upon another.

July 1, 1929, plaintiffs, stockbrokers in the City of Wheeling, purchased of defendant an indemnity bond insuring them against certain losses in connection with their business. In this proceeding the plaintiffs seek to fasten liability upon the defendant under certain provisions of the bond. Two items are involved.

The first item is for 44 shares of Columbia Gas & Electric Company common stock of the value of $3,952.96, the certificate for which is alleged to have been lost. The second item is for the sum of $2,373.18 representing a loss attributed to alleged dishonest conduct of an employee.

The pertinent provisions of the bond with respect to the first of said items are as follows:

> "* * * Underwriter * * * agrees to indemnify the Insured * * * against any loss * * * of * * * certificates * * *.
>
> "(B) Through * * * destruction or misplacement or mysterious, unexplainable disappearance, while the property is within any of the Insured's offices * * * or upon the premises of the Insured's bankers in the

United States, or in any recognized place of safe deposit in the United States or lodged or deposited in the United States for exchange, conversion, registration or transfer, not including, however, the intransit risk. * * *

"2.   This bond does not cover—

"(f)   Any loss of Property, unless prior to the occurrence of such loss an Employee or partner of the Insured shall have examined such Property and made a record thereof, which shall contain the nominal value and description of such Property and be sufficient for the purpose of determining the amount of such loss."

The pertinent provisions with respect to item two are as follows:

"* * * Underwriter * * * agrees to indemnify the Insured * * * against any loss * * * of * * * money * * *.

"(A)   Through any dishonest act of any of the employees wherever committed and whether committed directly or by collusion with others. * * *

"2.   This bond does not cover—

"(e)   Any indebtedness or balance due the Insured or any customer's account, whether the account of an actual bona fide customer or a fictitious account; without prejudice, however, to the rights of the Insured with respect to any loss sustained through trades fraudulently conducted by an employee in the name of a genuine customer * * *."

Deeming the plaintiffs' evidence in support of the first item to be insufficient, the court excluded the same from the jury.

As to the second item the court first directed a verdict for the plaintiff but later reversed this finding and granted defendant a new trial, stating that the loss grew out of "a customer's account" and was, therefore, not covered by the bond; and that the employee's conduct was "dishonest only in the sense that any act of disobedience is dishonest—that is, any act of disobedience when such act may result in financial loss to the person whose command is disobeyed. The loss in the final analysis came about by reason of the insolvency of the de facto customer."

In July, 1929, plaintiffs opened an office in the City of Wheeling; they had previously opened an office in Washington, Pennsylvania. There was much confusion in both offices at this time and certain discrepancies appeared in their book accounts. There seemed to be a shortage in Columbia Gas & Electric Company common stock as well as of certain other stocks. An extensive check of plaintiff's books and accounts was made by a number of expert accountants in an effort to determine how the shortages arose.

With respect to the first item (44 shares Columbia common) the circuit court reasoned well as follows:

> "The difficulty with which the court found it had to contend was that while this particular shortage was not disputed, there was no way whatsoever to show how that shortage arose. For instance, not only was there no showing that any forty-four share certificate had ever been received at the offices of the company but there was similarly no showing that any number of certificates which added together would total forty-four shares was received. At the very outset we were met with the possibility that the entire shortage might be accounted for by the delivery of one certificate calling for forty-four shares more than a particular customer was entitled to receive. Evidently the plaintiff has paid for these shares and the plaintiff does not have them. There the proof stops. It requires bookkeeping to show this shortage on the part of the plaintiff.
>
> Plaintiff offered to prove by the expert accountants that this stock must have been in one or the other of plaintiff's offices and that its loss could only have come about therefrom. This may be true, but the wildest construction of these two paragraphs in relation to property, will not justify the court in holding that the policy was intended to cover a loss of this nature. With all recognition of the authorities that policies must be construed against the insurer, it is quite clear that this policy was intended to cover the loss of specific property and the clause requiring a description to be kept has a reason too obvious to require comment. In cases such as this, the sympathy of courts has universally been with the insured and every reasonable effort is always made to construe policies so as to require payment. This is merely another way of saying that a contract will be

construed against the Insurer. So would it be in this instance if the court felt that it could possibly so construe it without deliberately setting aside the express language of the bond.''

By way of supplement to what the learned trial judge thus stated, we desire to lay emphasis on the fact that the provision of the bond involved in this phase of the case proposes indemnification, not of loss disclosed alone by bookkeeping, but loss of identified physical property. Therefore we are of opinion that the trial court did not err in refusing to admit the proposed testimony of accountants, who had examined the affairs of the plaintiffs' office, that the 44 shares of Columbia common had been lost in one of the offices of plaintiffs. This, at best, would have been only opinion evidence and not sufficient upon which to base liability of the bonding company. This evidence would have been far short of the requirement of the bond that an employee or partner ''shall have examined such Property and made a record thereof.''

With respect to the second item the evidence discloses that Vernon Leslie was employed by plaintiffs in their Washington office as a ''mere clerk'', without authority to make contracts with customers or to open a customer's account. Leslie in August, 1929, opened an account and gave orders for stock in the name of Edna Weil. He would order the stock to be delivered to a bank with draft attached. This process taking several days, the stock would be sold on a rising market before the certificates arrived and the money derived from the sale used to take up the draft. He was discovered in this practice at a time when no loss had resulted to plaintiffs and he was expressly forbidden to continue such activities. Contrary to these instructions, he persisted until caught by a falling market and the loss complained of was sustained by plaintiffs. Plaintiffs say that in order to open an account with them it was necessary for a customer to sign a contract, comply with certain rules and regulations, and establish certain credit. It is the contention of plaintiffs that Edna Weil did not comply with these regulations and hence was not a customer and the transactions by Leslie did not constitute an account. But the evidence reveals that the Weil account extended over a period of more than two months. There was carried for her by the

plaintiffs a regular ledger account which discloses numerous purchases and sales for her. The debits and credits appear as carried in other customers' accounts. A check was paid to her for certain profits she realized. A service charge was made against her. When the loss came the plaintiffs endeavored to have Mrs. Weil and her husband cover the same.

These facts taken together fully justify the trial court's conclusion that the Weil transactions were those of a customer, and that the loss there incurred grew out of a customer's account and was not attributable to dishonest conduct of an employee.

Cases directly in point seem to be unavailable and those cited by counsel do not help very much. They are merely analagous to the situation at bar, and do not lay down any general principle that is of assistance here. In the last analysis this case turns on the making of proper application of simple contractual provisions. We have undertaken to give to those provisions the meaning that the words convey under their common acceptation. To sustain this simple process of judicature no citation of authority is necessary.

We affirm the judgment of the trial court.

*Affirmed.*